ESTATE OF MAY M. SULLIVAN, Deceased, CORNELIUS F. J. SULLIVAN and MORTIMER J. SULLIVAN, Administrators, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Sullivan v. Commissioner
Docket No. 7485-70.
United States Tax Court
T.C. Memo 1974-38; 1974 Tax Ct. Memo LEXIS 281; 33 T.C.M. (CCH) 183; T.C.M. (RIA) 74038; February 11, 1974, Filed. *281 The decedent and her sister, both unmarried, lived together for many years. The sister had a history of cancer. Some 4 months prior to decedent's death the sister transferred two parcels of real estate to decedent and 12 days prior to decedent's death the sister transferred certain securities to decedent. The petitioner claimed that the transfers were invalid because the sister was incompetent. The decedent also held funds in joint bank accounts and trustee accounts on her death. HELD: The transfers by the sister effectively vested ownership in the securities and real estate in the decedent. Such transfers are not subject to collateral attack. HELD, further: Amounts held in joint and trustee bank accounts includable in gross estate. 2 David Beck and Jeffrey Barton Cahn, for the petitioners.
Thomas S. Carles, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: The respondent determined a deficiency in the Federal estate tax of the Estate of May M. Sullivan in the amount of $33,671.03. Cornelius F. J. Sullivan and Mortimer J. Sullivan, nephews of the deceased, are the duly qualified administrators of the estate.
Certain concessions having been made by *282 petitioner, those issues remaining for our decision are as follows:
(1) Whether the total value of certain securities, held in decedent's name as of the date of death, is includable in decedent's gross estate pursuant to the provisions of section 2031 or 2033. [1]
(2) Whether the total value of two parcels of real estate held in decedent's name as of the date of death is includable in her gross estate pursuant to the provisions of section 2031 and 2033. 3 (3) Whether the total balances in certain bank accounts as of the date of death, held by decedent and her sister as joint tenants, are includable in decedent's gross estate pursuant to the provisions of section 2040.
(4) Whether the total balances in certain other bank accounts as of the date of death, held in decedent's name in trust for her sister, are includable in decedent's gross estate pursuant to the provisions of section 2036.
Resolution of issues (1) and (2) is wholly dependent upon a finding by this Court as to the competency of Julia A. Sullivan, decedent's sister, to make certain transfers to the decedent.
FINDINGS OF *283 FACT
Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.
May M. Sullivan (hereinafter referred to as "decedent" or "May"), at the time of her death on October 22, 1966, resided in Queens County, New York. 4 Cornelius F. J. Sullivan and Mortimer J. Sullivan, decedent's nephews, were duly appointed as administrators of the estate by the Surrogate's Court of Queens County, New York, on December 7, 1966. A Federal estate tax return was timely filed with the district director of internal revenue at Brooklyn, New York, on October 26, 1967, showing a taxable estate in the amount of $69,164 and a net estate tax payable of $4,536.
Throughout the later years of her life, decedent was a retired New York City schoolteacher, who, until 1965, resided with her sister, Julia Sullivan (hereinafter referred to as "Julia"), also a retired schoolteacher, in an apartment on West End Avenue in New York City. Both of the sisters were spinsters.
Of the two sisters, May was by far the healthier. Julia had suffered from cancer of the stomach and bowel from at least 1961, when she underwent the first of a number of operations, *284 and had great difficulty controlling her bodily functions. The practically full-time care required by Julia was provided by her sister, May, the decedent. 5 In 1965, Mortimer Sullivan, the brother of May and Julia, fell ill. At that time, May moved, together with her sister, to Mortimer's home in Queens where May tended to the needs of both her brother and sister.
On September 29, 1965, approximately 4 months after his sisters came to live with him, Mortimer Sullivan died, leaving a will drawn prior to his wife's death in 1961. Under the terms of his will, except for a few small specific bequests, all of his property went to Julia and May as joint residuary legatees.
Among the property left to May and Julia was a substantial amount of stock as follows: No. of Shares
Security 240
American Tel. & Tel. Co.
200
Cerro Corp.
15
General Motors Corp.
120
General Tel. & Electronics Corp.
15
E. I. DuPont & Co.
200
El Paso Natural Gas Co.
100
National Lead Co.
20
General Electric Co.
211
Gulf Oil Corp.
100
National Cash Register Co.
100
Pennsalt Chemicals Corp.
415
Union Oil of California
100
McKesson & Robbins, Inc.
200
Pan American Sulfur Co. 6 The foregoing shares were divided substantially equally and held in the *285 individual names of the two sisters.
Also among the property left to May and Julia were two parcels of real estate. The first was the house and lot where Mortimer made his residence and the second was an unimproved lot in Suffolk County, Long Island, New York.
In addition to property passing under the will, May received the proceeds of Mortimer's pension plan and life insurance, under each of which he had designated May the beneficiary following his wife's death. The total proceeds from Mortimer's pension plan were $54,699. Of that amount, approximately $45,000 was deposited in a bank account entitled "May M. Sullivan in trust for Julia A. Sullivan." The total proceeds of Mortimer's life insurance paid to May amounted to $18,247.
In addition to the operation Julia had in June 1961, she was twice again operated on for cancer of the bowel. In December 1962 and December 1965, surgery was performed to remove or sidetrack obstructions of the bowel produced by the cancer. 7 On June 13, 1966, Julia executed two deeds conveying to May her interests in the Queens residence and the Long Island lot received from Mortimer. Such deeds, duly recorded on July 7, 1966, recited a nominal consideration *286 for the transfer. On October 4, 1966, Julia was admitted to the hospital after she fell at home sustaining a fracture of her pelvic bone. Her admission record, dated October 4, 1966, bears a notation that the patient is "very confused & [poor] memory and is a poor historian." The fracture sustained by Julia was a minor one, requiring little treatment. However, another developing obstruction of her intestine was discovered for which she ultimately underwent surgery on November 1, 1966.
On October 10, 1966, while still hospitalized, Julia executed a letter to Bear Stearns and Co., stockbrokers, which stated:
Please have the enclosed securities I now hold transferred to the name and account of my sister, Miss May M. Sullivan, and please charge the cost of transfers to her account. 8 The letter bore two stamps placed thereon by the Chemical Bank New York Trust Co. The first, indicating "signature guaranteed" had been stricken out. The second, indicating "signature compares favorably with Chemical Bank New York Trust Company 102nd Street Office," was intact and bore a signature, presumably that of a bank employee.
Bear Stearns and Co. duly transferred the securities from Julia's account *287 to May's account in accordance with the instructions contained in the letter of October 10. Despite an extended period of time within which to do so, petitioner has produced no evidence indicating that Julia A. Sullivan's signature on the October 10 letter was not genuine.
On October 22, 1966, while visiting Julia in the hospital, May M. Sullivan died of a heart attack.
On October 22, 1966, after May's untimely death, Wallace Marnell (hereinafter sometimes referred to as "Marnell"), an attorney, and his son-in-law, Cornelius Sullivan (an administrator herein) went to the sister's 9 apartment where they discovered certain papers evidencing the transfer of the securities from Julia to May on October 10, 1966.
On the following day, Wallace Marnell sent to Bear Stearns & Co. a telegram over the signature of Julia A. Sullivan which stated:
HOLD ALL SECURITIES IN MY NAME.DO NOT TRANSFER TO MY SISTER MAY M SULLIVAN AS SISTER DIED SUDDENLY OCTOBER 22 1966.
On the same day, Marnell sent a letter to Bear Stearns & Co. which stated:
I represent Julia A. Sullivan, of 895 West End Avenue, New York, New York.
All securities registered in her name and deposited with you, including: [listing certain securities] *288 * * * are to be held in her name until further written notice and not transferred to her sister, May M. Sullivan, as her sister died suddenly on October 22, 1966.
Yours very truly,
WALLACE MARNELL
Marnell's attempts to stop the transfer of Julia's stock to May were unsuccessful and the stocks so transferred were held in May's name at her death. 10 Julia Sullivan died on December 5, 1966, at the age of 77, without ever having left the hospital.
During her last hospitalization, Julia was lucid, able to recognize her physician and to understand what he told her about her condition. At the same time, she was subject to periods of drowsiness and confusion immediately following the receipt of sedation for the relief of her pain. Julia remained lucid and responsive up until the last two weeks prior to her death when she became incoherent at times, possibly due to the sedatives administered. Not until the first or second of December, immediately prior to her death did Julia lapse into a semi-comatose condition.
Prior to her last hospitalization, including the summer of 1966, Julia paid regular visits to her physician at three-month intervals. During those visits her doctor had no question *289 as to her competency. 11 She was lucid and coherent, able to converse, and aware of her condition. She was aged and physically debilitated, but in possession of her mental faculties.
Despite the somewhat aberrant behavior ascribed to Julia by acquaintances and members of the family, no application was ever made to have Julia declared incompetent nor was a guardian ever appointed for her. She never had any history of mental illness nor had she ever seen a psychiatrist or been confined in a sanitarium.
In his determination of the deficiency due from the Estate of May M. Sullivan, respondent included the value of certain shares of stock transferred by 12 Bear Stearns and Co. from the account of Julia Sullivan to that of her sister, the decedent, as follows: No. of Shares
Company
Date of Death Value
Dividends 128 *
McKesson & Robbins, Inc.
$ 5,456.00
50
National Lead Co.
2,771.88
50
Pennsalt Chemicals Corp.
1,928.13
$12.50
120
American Telephone & Telegraph
6,585.00
8
DuPont
1,184.50
100
El Paso National Gas Co.
1,762.50
10
General Electric
933.75
6.50
105
Cerro Corp.
3,497.82
60
General Telephone
2,535.00
208
Union Oil of California
11,336.00
62.40
8
General Motors
578.00
106
Gulf Oil
6,167.88
53
National Cash Register
3,166.75
100
Pan American Sulphur Co.
1,281.25
*290 13 In the estate tax return of the decedent, the full value of the two parcels of realty located in Queens and Long Island, New York, in the amount of $33,150, was included as belonging to the decedent. Petitioner now contends that the amount so included should have been reduced by 50 percent to reflect Julia's interest in said parcels. Respondent has disallowed that claim.
As of the date of May Sullivan's death, there existed the following bank accounts held in the names of "May M. Sullivan or Julia A. Sullivan": Depository
Account No.
Date of Death Balance Emigrant Industrial Savings
1,271,570
$ 2,755.18
East River Savings
347,717
1,302.75
Broadway Savings
175,985
2,174.63
Union Dime Savings
20,069,902
1,134.42
Bank for Savings
53,995
134.21
East River Savings
C 347,809
2,767.71
Emigrant Industrial Savings
1,271,725
19,138.47
Broadway Savings
176,045
12,053.35
New York Bank for Savings
88,083
26,061.43
TOTAL
$67,522.15 14 In the estate tax return, the foregoing amounts were included only to the extent of $45,015, *291 purportedly reflecting a proportionate reduction for Julia's interest in said accounts. Respondent has included the total amount in decedent's estate.
As of the date of May Sullivan's death, there also existed the following bank accounts, held in the name of "May M. Sullivan in trust for Julia A. Sullivan": Depostiory
Account No.
Date of Death Balance Bowery Savings Bank
1,075,465
$44,617.96
First National City Bank
077,009,718
386.52
Total
$45,004.48
In the estate tax return, the foregoing amounts were included only to the extent of $22,986, purportedly reflecting a proportionate reduction for Julia's interest in said accounts. Respondent has included the total amount in decedent's estate. 15 OPINION
On October 10, 1966, Julia A. Sullivan, decedent's sister, executed a letter directing that certain securities held in her name be transferred to the account of the decedent. Pursuant to those instructions, Bear Stearns and Co. duly made the transfer. Accordingly, on the date of her death, May M. Sullivan was the record owner of such shares, which were included in her estate by the respondent in his determination of the deficiency.
Petitioner contests respondent's determination on two grounds. *292 First, it is argued that "Julia Sullivan was, on October 10, 1966, incompetent to know the nature and quality of her acts or to manage her own affairs. She could not have had the donative intent to make the gift of the securities left to her by her deceased brother."
We must reject such a contention. During the course of the trial this Court was presented with the testimony of two nurses, a priest, an attorney, and the 16 decedent's nephew, all of whom described Julia as lacking in any ability to recognize family members, to converse, or to understand her situation or surroundings. Several of those witnesses described certain of Julia's physical problems as well. She had to be cared for on practically a constant basis by her sister, she had difficulty controlling her bodily functions, and she was generally an aging, sick woman.
We have no doubt as to Julia's physical limitations. However, under close scrutiny and in light of other testimony in the record, the evidence presented by the petitioner concerning Julia's mental capacity does not warrant a finding of incompetence. Both of the nurses saw Julia only at times of great stress, for example, at the funerals of close relatives *293 and immediately following her fall causing the pelvic fracture. The priest saw Julia for a period of only two minutes while she was hospitalized during which time he made no attempt at conversation. 17 On the other hand, Julia's physician, who had attended her throughout her illness over a period of years, had no reservations as to her ability to know the nature of her acts. Further, throughout the later years of her life, Julia's relatives were constantly attentive to her physical deterioration, but no action indicative of diminished mental capacity was ever taken. No application was made to have Julia declared incompetent, nor was a guardian appointed for her. Cf. David L. Zips, 38 T.C. 620 (1962). She had never seen a psychiatrist or been confined in a sanitarium. The evidence presented falls woefully short of that required to show that Julia was incompetent to direct the transfer of her securities to her sister on October 10, 1966.
Petitioner also contends that Julia's signature on the letter of October 10, 1966, was not genuine, intimating that it was forged by May. Such contention is without merit. Despite an extension of time granted by this Court within which to do so, *294 petitioner produced no evidence impinging upon the validity of 18 the signature. We note further that the Chemical Bank New York Trust Co. indicated that the signature "compared favorably" with that of Julia.
By two deeds, each dated June 13, 1966, Julia conveyed to May all of her right, title and interest in parcels of real estate formerly owned by her brother, Mortimer, located in Queens and Suffolk Counties, New York. As of the date of her death, May therefore owned all of the right, title and interest in the subject parcels. Petitioner contends that the transfers were invalid in that Julia was mentally incompetent to make such conveyances.
We must again reject petitioner's contention. The only competent evidence with respect to Julia's mental state in June of 1966 is the testimony of her physician. His testimony is not indicative of diminished mental capacity. Accordingly, we are constrained to hold that petitioner has failed to meet its burden of proving Julia's incompetence. The transfers whereby May received complete ownership of the subject parcels must be accorded validity. 19 Moreover, we do not feel that this Court is the proper forum for such a challenge to the validity *295 of these transfers. From the fact that the administrators herein were appointed by the Surrogate's Court of Queens County, New York, we may presume that the Estate of May M. Sullivan went through some form of probate in that jurisdiction. However, there is no indication in the record that the transfers of the securities and real estate here in issue were not accorded validity in that proceeding and it would appear that those items were distributed from the estate in accordance with the laws of New York. To permit petitioner such an argument here would be to sanction a collateral attack upon matters more properly the subject of initial decision by the state courts. Under the particular facts of this case, such an attack is inappropriate.
As of the date of May M. Sullivan's death there existed joint bank accounts held in the names of "May M. Sullivan or Julia A. Sullivan" with an aggregate balance of $67,522.15. 20 The respondent has determined the entire amount to be includable in decedent's gross estate, pursuant to the provisions of section 2040. [2] *296 21 subject accounts in excess of $19,000 were inherited by the two sisters from the estate of their brother, Mortimer. Therefore, it argues, that portion inherited individually by Julia should be excluded from May's estate pursuant to section 20.2040-1, *297 Estate Tax Regs.
We are constrained to reject petitioner's contention. While there can be no doubt that the sisters did in fact inherit substantial sums from their brother's estate, there has been no proof adduced that the amounts thus received were actually deposited to the accounts here in issue. We are not prepared to infer that Mortimer's estate was the source of those funds. Furthermore, even assuming such to be the case, we are unable from the record to determine the specific amounts so deposited. Accordingly, respondent's determination must be sustained.
Petitioner also argues the inequity of including these funds, again assuming they were received from Mortimer's estate, in determining the tax of three separate estates. In response to such argument we need only note that this Court may render its decision solely by applying the statutory rules enacted by the 22 Congress for the taxing of estates. Those rules do provide petitioner with some mitigation of the seeming inequities here encountered through the $60,000 exemption provided by section 2052 and the credit for tax on prior transfers provided by section 2013.
As of the date of May's death, there also existed bank accounts *298 held in the name of "May M. Sullivan in trust for Julia A. Sullivan" with an aggregate balance of $45,004.48.
The respondent argues that the entire amount should be included in decendent's gross estate, pursuant to the provisions of section 2036. [3] There si no dispute that the foregoing amounts were received by May as the beneficiary of Mortimer's pension plan or that she deposited such funds in accounts in trust for Julia. 23 Petitioner contends that it was May's intention to hold one-half of such amounts for Julia and that such portion should therefore be excluded from May's estate. We need not pass upon whether such a subjective intent is sufficient to exclude that portion from inclusion under section 2033 because *299 it is clear that the entire amount must be included under the provisions of section 2036.
Section 2036 provides, in pertinent part:
SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.
(a) General Rule. - The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death - (1) the possession or enjoyment of, or the right to the income from, the property, or
(2) the right, either alone or in conjuction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom. 24 On the basis of the record before us, there is no indication that May ever relinquished any of her rights in such amounts as would relieve her estate from their inclusion as required by the literal language of the statute. In fact, petitioner makes no such argument and chose not to file a brief opposing *300 respondent's arguments in this regard. To the contrary, petitioner's argument that only a portion of the amounts belonged to Julia expressly recognizes that May retained her rights in the amounts here in issue. Respondent must again be sustained.
To reflect concessions made by the parties,
Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
*. Respondent has since stipulated that the number of shares so held by May M. Sullivan should be 100, rather than 128. The resulting reduction will be taken into account in the computation under Rule 155. ↩
2. Section 2040 provides, in pertinent part:
SEC. 2040. JOINT INTERESTS.
The value of the gross estate shall include the value of all property to the extent of the interest therein held as joint tenants by the decedent and any other person, or as tenants by the entirety by the decedent and spouse, or deposited, with any person carrying on the banking business, in their joint names and payable to either or the survivor, except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth: Provided, That where such property or any part thereof, or part of the consideration with which such property was acquired, is shown to have been at any time acquired by such other person from the decedent for less than an adequate and full consideration in money or money's worth, there shall be excepted only such part of the value of such property as is proportionate to the consideration furnished by such other person: * * * 3. Respondent's determination in the statutory notice of deficiency with respect to this issue was predicated upon sec. 2033. In his brief, respondent relied upon sec. 2036. In response to its inquiry, the Court was advised that the petitioner waived its right to file any reply to respondent's brief. We therefore have no reluctance to decide this issue by application of section 2036. See Wilkes-Barre Carriage Co., 39 T.C. 839 (1963), affd. 332 F.2d 421↩ (C.A. 2, 1964).